**D'LO ROYALTIES, INC., Plaintiff,**

v.

**SHELL OIL COMPANY, Defendant.**

Civ. A. No. 72J-35(R).

United States District Court,
S. D. Mississippi,
Jackson Division.

Feb. 21, 1975.

---

Kenneth Franks, Jackson, Miss., and Robert H. McFarland, Bay Springs, Miss., for plaintiff.

William F. Goodman, Jr., Jackson, Miss., for defendant.

## OPINION OF THE COURT

DAN M. RUSSELL, Jr., Chief Judge.

Plaintiff, D'Lo Royalties, Inc., a Jackson, Mississippi corporation, brought this diversity of citizenship action against Shell Oil Company, organized and existing under the laws of Delaware, seeking to cancel certain oil, gas and mineral leases, which plaintiff claims expired prior to the time the defendant commenced operations toward the drilling of a test well on the leased premises. Plaintiff claims that the defendant drilled a well, after the expiration of all four leases, on acreage covered by one of the leases resulting in a dry hole, and that defendant's entry constituted a wrongful ouster of plaintiff and a trespass which has condemned the minerals owned by plaintiff in the remaining leased premises. Plaintiff seeks damages equal to the market value of the alleged condemned minerals.

Defendant, Shell Oil Company, in its response, averred that, on and before the expiration date, it had in fact and in good faith commenced operations toward the drilling of a test well on a portion of the leased premises and that said well, D'Lo No. 1, was subsequently drilled in accordance with the provisions of said leases. By way of further answer defendant claimed that it duly tendered delay rentals provided for under the leases; that plaintiff accepted same and only undertook to return same prior to filing suit and that plaintiff is now estopped to question the validity of the leases.

Prior to trial plaintiff set forth in a pre-trial order a summary of facts claimed by it as follows:

"Although on March 14, 1969, some preliminary activities, which plaintiff contends were not diligently pursued, had taken place concerning the preparation of the location for the drilling of a test well in Section 27, Township 4 North, Range 3 East, Rankin County, Mississippi, which was covered by plaintiff's leases to defendant, no drilling rig was located on the premises as of March 14, 1969. On March 28, 1969, the Board of Directors of plaintiff contacted Mr. John C. Marshall, Onshore Division Land Manager for defendant, concerning the defendant's intentions at that time to drill the test well as called for by the leases. Prior to talking to Mr. Marshall, the Board of Directors of plaintiff had contacted Mr. Herman Bridges,

an employee of defendant, and asked him what defendant's intentions were as to the drilling of a test well to the required depth. He replied he did not have authority to provide an answer to plaintiff but would put them in touch with Mr. Marshall who did have such authority. Mr. Marshall's reply was that at that time not even the President of Shell Oil Company could answer the question posed by the plaintiff's Directors and until the Garrett Well, located on Section 28, had been tested, no one in defendant's organization could say whether the well required under plaintiff's leases to defendant would be drilled. Mr. Marshall further stated that if the Garrett Well tested as high as 75% $CO_2$ then a well on plaintiff's property would not be drilled. Upon receiving this information, plaintiff informed defendant that it considered the leases terminated for failure to comply with the drilling provisions contained therein. Plaintiff contends that defendant as of March 14, 1969, did not have an unconditional and unqualified intent to drill the well called for by the lease contract and, as a result, none of defendant's preparatory activities prior to March 14, 1969, served to keep the leases in full force and effect. Plaintiff contends that it was not until after the Garrett Well was tested and determined to be commercially productive did defendant form the requisite intent to comply with its contract as evidenced by, among other facts, that it was not until after the Garrett Well was tested that defendant approved an AFE for the expenditure of funds, applied for and received a permit to drill the well from the Oil and Gas Board, set conductor pipe, or entered into valid, binding contracts for the drilling of the well. Defendant, after notice from plaintiff that the lease had expired, drilled a well on lands covered by the four leases which was dry and, as a result thereof, condemned the minerals under the lands covered by Exhibits 'B', 'C', and 'D' to the complaint.

As to the lands covered by Exhibit 'A' to the complaint, the plaintiff further contends that a portion of the lands covered thereby were included in the unit for the Shell-Burch No. 1, which was shut in on November 9, 1971. Under the terms and provisions of Exhibit 'A', shut-in royalty payments were due as to the acreage included in the Burch Unit within ninety days of the shutting in of the unit well. The shut-in payment was made by defendant to plaintiff on April 27, 1972, which is in excess of 90 days from the date of shut-in."

The defendant summed up its side of the case as follows:

"The four Leases provided that within one year from their date Shell would commence '. . . operations toward the drilling of a test well . . .' Prior to March 14, 1969, Shell commenced reasonable, necessary and good faith operations toward the drilling of the test well. The result of these operations was that before March 14, 1969, the well location had been determined and staked, a site contractor had been engaged by Shell, a right-of-way had been cleared for the road which was to connect the well location to the existing public road, construction of the roadbed had begun, and clearing of the location site and pit areas was underway. All of this work was known by D'Lo to be required as a basis for and in advance of the actual drilling.

Officers of D'Lo observed the road and well location construction on March 14, 1969, and thereafter, but in late March 1969, having seen no rig at the site, D'Lo inquired of Shell's Land Division as to whether the operations then in progress would continue. Although at that time the operations toward drilling were being handled by Shell's Production Division subject to the direct control of the General Manager, Shell's Land Division Manager

informed D'Lo that while Shell was proceeding with operations toward the drilling of a test well, no particular representative of Shell could assure D'Lo that Shell would continue drilling operations to a depth of 17,000 feet, or to a depth sufficient to reach the Jurassic, if at some later date Shell should find it to be impossible or impractical to continue the drilling operation. The substance of the conversation was that Shell was then doing everything possible toward commencement of actual drilling and intended to continue, although he could not personally assure D'Lo that Shell's management might later find it necessary to abandon drilling operations.

Officers of D'Lo made additional visits to the well site and found no indication at any time that the operations were being abandoned. In fact, in March 1969 Shell completed the construction of the roadbed, laid a board road, constructed a reserve pit and a fresh water pit and levelled the location and provided necessary drainage. In early April 1969, Shell secured a drilling permit from the State Oil and Gas Board (which routinely was applied for and granted following necessary pre-drilling activity), a rig mat and turn-around area were constructed, the surface conductor pipe was set, the water well was drilled and an initial rig was moved in. The well was spudded April 21, 1969.

On April 22, 1969, D'Lo informed Shell in writing that the four leases were considered void. Necessary operations toward drilling had then been completed and actual drilling had begun. Shell responded to D'Lo by letter dated April 30, 1969, that it had been and was continuing to comply with all of the requirements of the leases.

The well was drilled to a total depth of 20,724 feet at a cost of $2,197,705.-00. It was not commercially productive.

From 1969 to 1972 Shell made all required delay rental payments under all of the leases. No question in this respect was raised by D'Lo until just prior to the filing of this litigation.

In February 1969 Shell believed the Garrett Well to be a producer, and this was the general opinion of the oil and gas industry. Since the final production tests for the Garrett Well were not performed until April 1969, D'Lo suspicioned that Shell was delaying the drilling of the D'Lo well awaiting such test results. But in fact Shell acted as early as February 24, 1969, to protect its investment and all necessary pre-drilling operations were diligently and continuously accomplished between February and April 1969.

Eighty acres owned by D'Lo and covered by Exhibit 'A' to the complaint was included within the 1280 acre gas unit of the Shell-Burch No. 1 Well. The Burch Well was ultimately shut-in, and when the primary terms of the four leases expired March 13, 1972, Shell then had a period of 90 days within which to keep in effect the lease attached as Exhibit 'A' to the complaint. A timely tender of shut-in royalty was made in April 1972."

The action proceeded to trial and was heard by the Court, without a jury, on the issue of liability only, the amount of damages, if any, being reserved for a subsequent trial.

Both parties agree that on March 14, 1968, plaintiff, as lessor, and defendant, as lessee, entered into four leases covering 1080 acres in Rankin County, Mississippi, copies of these leases being exhibits P–1 through P–4. Each of said leases contains the following:

"17. NOTWITHSTANDING ANY PROVISION OR PROVISIONS CONTAINED HEREIN TO THE CONTRARY.

Lessor, under even date herewith, has executed and delivered unto lessee three (3) other separate and accompanying Oil, Gas and Mineral Leases covering additional lands owned or claimed by lessor in Rankin County,

Mississippi. With regard to the lands covered by this lease, together with the lands covered by the three (3) accompanying leases, it is mutually agreed and understood as follows, to-wit:

This lease, together with the three (3) accompanying leases, shall be null and void, unless on or before twelve (12) months from the date hereof, lessee shall commence or cause to be commenced, operations toward the drilling of a test well for oil, gas or other minerals, at a location of lessee's choice, on lands covered by this lease, or on lands covered by any one of the three (3) accompanying leases, to a depth of 17,000 feet, or to a depth sufficient to reach the Jurassic, whichever is the lesser depth, unless at a lesser depth, heaving shale, excessive salt water flow, mechanical difficulty, impenentrable formation, or other condition should be encountered making it impossible or impracticable to continue further drilling."

Robert A. Biggs, Jr., secretary-treasurer of the corporate plaintiff and experienced in oil and gas leases, testified that toward the end of the one-year drilling period, Shell asked for an extension of time, offering first the sum of $10,000.00, later increased to $25,000.00. Plaintiff refused both offers. On March 14, 1969, Biggs said that he and William F. Van Zandt, plaintiff's president, drove to the proposed well site. They saw a bulldozer and a crew clearing trees for a road to be constructed from a public road to the well site. At this time the Garrett well, being drilled by Shell in an adjacent land section, had not been completed, nor had a drilling permit for D'Lo No. 1 been issued to Shell by the Mississippi Oil and Gas Board. Biggs made subsequent trips to D'Lo No. 1, noting that a board road had been laid to the well site, but no drilling had begun. He stated that plaintiff's board of directors, three in number, then decided to ask Shell its intentions toward drilling. They met with Herman B. Bridges, Shell's senior land man in the Jackson area in Biggs' office on a date later established as March 28, 1969. Bridges said he did not know the status of the well, but would put plaintiff's directors in touch with Bridges' superior, Mr. John C. Marshall, on-shore division land manager with offices in New Orleans, Louisiana, who Bridges said would know. Thereupon a call was placed by Bridges in Biggs' office to Marshall. Biggs stated that he asked Marshall if Shell intended to drill under the D'Lo leases and that Marshall's reply was that not even the president of Shell Oil Company could answer that question until the Garrett well was tested, and, if the Garrett well tested as high as 75% carbon dioxide, then a well on plaintiff's property would not be drilled. Biggs stated that he repeated Marshall's statements to the other board members present, who then discussed the conversation with Bridges, notifying him that plaintiff considered the leases void and terminated. Biggs identified a letter of April 22, 1969 written by Van Zandt to Bridges formally notifying him that plaintiff considered the leases forfeited on the basis of the conversations of March 28, 1969, and requesting a recordable instrument releasing all the lands covered by the four leases. Biggs acknowledged that Marshall responded to this letter on April 30, 1969, advising that Shell had complied with all the requirements of the leases and considered them good and valid. On cross-examination, Biggs admitted he, personally, negotiated the leases with Bridges and kept up with oil well drilling in Rankin County, particularly Shell's Garrett well. He had picked up reports that gas was encountered and said the general feeling in 1969 was that the Garrett well was productive. He, nonetheless, voiced plaintiff's intention to hold Shell accountable under the D'Lo leases. He admitted that drilling operations included preliminary work, such as staking the site and building a road, but felt that Shell was "playing around." He admits in the telephone conversation with Marshall, alleged to be on March 28, 1969,

that he did not at that time tell Marshall that plaintiff considered the leases terminated. He admitted that on his trips to the site after March 14, 1969, he saw no indication that Shell had abandoned the drill site. He acknowledged that plaintiff received delayed rentals from Shell in the sum of $5.00 per acre, unusually high, via plaintiff's banking depository for the years 1969, 1970 and 1971, which were not returned to the bank until shortly before suit was filed in March 1972. He acknowledged that he wanted Shell to drill and hoped the well would be productive. He also knew that Shell had successfully petitioned the Oil and Gas Board to include 80 acres of the leased premises within the 1280 acre gas unit of Shell's Burch No. 1 well, the hearing on same having been attended by one of plaintiff's board directors, and that Shell had tendered shut-in royalties on this acreage in April 1972.

Van Zandt, president of the plaintiff corporation, accompanied Biggs to the D'Lo No. 1 well site on several occasions. Prior to 3/14/69, he saw nothing going on at the well site, but admitted that on that date a road was being cleared to the site from a public road. He was at the meeting with Bridges and other of plaintiff's board members, and corroborated Biggs' account of the telephone conversation with Marshall. He acknowledged that he wrote the letter of April 22, 1969, to Marshall, earlier identified by Biggs. On cross-examination, he admitted that, although the leases utilized defendant's forms, D'Lo prepared the essential conditions, that is, that delayed rentals were in the sum of $5.00 per acre instead of the usual $1.00; a ⅗₆ths royalty was provided for instead of the usual ⅛; that the primary term was limited to 4 years, instead of the usual 10 years; and that the clause including properties owned or claimed by the lessor adjacent to the described acreage was stricken.

Plaintiff offered the testimony of Wilbur H. Knight, a consulting petroleum geologist, whose qualifications have been accepted by the Oil and Gas Board of Mississippi and Oklahoma. He stated that the normal procedure in developing a field is not to drill a second well until all information has been assembled from the discovery well, including production tests. If the discovery indicates commercial production then field crews go out and stake the location sites for other wells. Drilling permits are then secured, drilling contracts let, and drilling proceeds without interruption until the required depths are reached. The witness claimed to be familiar with all wells in the Thomasville Field, Rankin County, including the drilling records of D'Lo No. 1. In his opinion, had the Garrett well, the discovery well, not been productive, Shell would not have drilled D'Lo No. 1. He stated that the best and most positive test of productibility is an actual production test through the casing. The Garrett well was so tested from April 2 through April 9, 1969. When posed with a hypothetical question assuming facts claimed by plaintiff, that is, that on March 14, 1969, a 12 foot wide road had been cleared from a public road to the site of the D'Lo location, the first production test on the Garrett well was obtained on April 2, 1969, a drilling permit for the D'Lo No. 1 well was applied for and obtained on April 9, 1969, there existed an AFE (authority for expenses) for the D'Lo well dated April 9, 1969, an intermediary drilling rig was contracted for a maximum depth of 11,000 feet, and a contract for drilling to total depth was not executed until April 16, 1969, his opinion was that on March 14, 1969, Shell had not decided to drill D'Lo No. 1. The remaining portion of Knight's direct examination went to the issue of damages which the parties reserved for a later hearing. On cross-examination, Knight said he was a geologist, not a drilling expert, but that he had employed stake-out crews and drilling contractors. Although he had not visited the D'Lo site, he conceded that before a well is spudded, there are certain operations to be carried out on the ground as a part of the total drilling operations. These include staking the lo-

cation, exhibiting same to contractors, preparing entrance roads, providing drainage, clearing the location to an area of two to three acres if for a deep well, leveling trees, boarding or graveling the entrance road if necessary, digging the reservoir pits, sinking a water well, and laying the foundation or matting for the rig. He conceded that the exact location must be determined before a drilling permit could be applied for. However, he insisted that in an established field with numerous producing wells, oil people know what they have, but in a sour-gas field such as the Thomasville Field, there is no exact knowledge except what can be learned from the discovery well, in this case, the Garrett well, and hence he said no other facts would change his opinion that on March 14, 1969, despite the preliminary operations, Shell had no firm intention of drilling the D'Lo well. At the same time he admitted that Shell relies heavily on electric logs, is a leader in developing electric logs as a diagnostic means of testing productivity before production tests can be run, and finally, he admitted that if Shell had a deadline, Shell would have to rely on such information as it then had short of production tests.

Plaintiff's final witness was Thomas O. Kelly, a heavy equipment operator, who, with his brother, has prepared drilling locations for some sixteen years. He uses bulldozers, draglines and labor crews. He inspected the D'Lo site twice, once in October 1972 and shortly before the trial. From his last observations, he described the general area as sloping and level on cut-over timber land. The timber on either side of the access road is oak and pine of 8 to 10 inches in diameter. Leading from a graveled county road, the access road declines for a distance of 800 feet before inclining to the well site, a total of 1230 feet. At the low point he found a 24 inch culvert. The access road, 12 feet in width, was boarded. He identified the well site by the well head, and saw one open, salt water pit approximately 6 feet in depth, a reserve pit, 250 × 300 feet,

filled in, and a smaller fresh water pit. With equipment consisting of two bulldozers and a dragline and a normal crew of 5 men to clear the timber and a crew of 8 men to lay the board road, it was his opinion, without weather data, that he could have prepared the location in seven days, and, if raining every day, in ten days. On cross-examination this witness admitted that he had not seen the location prior to October 1972, more than three years after it was constructed. He said the county road had been improved to carry traffic to Shell's recovery plant, and, if it was impassible at times in 1969, this fact would change his opinion. Nor did he see a second culvert at the beginning of the access road from the county road. He admitted that some sites he had prepared had taken longer than ten days, particularly for a deep well. Nor had he ever had his dragline mired in preparing a well location.

Plaintiff, through its witnesses and by way of argument, concedes that preliminary activities or pre-drilling operations are an essential part of "operations toward the drilling of a test well", as such language reads in Paragraph 17 of the leases quoted above, but contends that such pre-drilling operations, if occurring at the expiration date of the leases, must be performed with the good faith intention to pursue with diligence the drilling of the well to the required depth, as provided in Paragraph 17, unless certain specified difficulties, not here involved, make it impossible or impracticable to continue further drilling. Plaintiff has found no Mississippi case in point, but relies on decisions from other states so holding. See Geier-Jackson, Inc., v. James, et al, 160 F.Supp. 524 (D.C.Tex.). In Geier-Jackson, Judge Sheehy was concerned with intent, saying intent is something that exists in a man's mind, and as the trier of facts cannot enter into the mind of a man to determine the intent with which he acted at a given time, intent must be judged by the actor's business experience and as reasonably prudent persons experienced in the affairs of everyday

life judge each other. In the case before him Judge Sheehy found that intent to drill on the happening of certain contingencies, such as favorable information gained from the drilling of a nearby well, is not sufficient. Plaintiff here simply says that, since the actual drilling or spudding of the well did not occur until after the expiration date of the leases and after production tests were run on the Garrett well, the facts and circumstances surrounding the preliminary work were not such as to evince a bona fide intention on the part of Shell as of March 14, 1969, to drill.

Although forfeitures are not ordinarily judicially favored, the rule seems to be otherwise where oil and gas leases are involved. "Even in a jurisdiction with a statute providing that a condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created, it has been stated that in the case of gas and oil leases, forfeiture is not looked on with disfavor, but, rather, with favor where it clearly appears that the lessee has failed or neglected to commence operations within the time specified in the lease, or *failed, thereafter to prosecute operations with diligence*." 38 Am.Jur.2d, "Gas and Oil", Section 99, pp. 565–6. (Emphasis added).

In responding to plaintiff's contentions that Shell, once it started its predrilling operations, did not proceed with such diligence as to evince a genuine interest to drill, Shell relies on the rule of law stated in 2 Summers Oil and Gas, Section 349 (2d Ed.), as follows:

"There are several provisions of an oil and gas lease which make it necessary to determine what constitutes the beginning or commencement of a well or of drilling or reworking operations. In the drill or forfeit development clause the lessee promises to commence the drilling of a well within a stated time. . . .

"The general rule seems to be that actual drilling is unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement of beginning of a well or drilling operations within the meaning of this clause of the lease. *If the lessee has performed such preliminary acts within the time limited, and has thereafter actually proceeded with the drilling to completion of a well, the intent with which he did the preliminary acts are unquestionable, and the court may rule as a matter of law that the well was commenced within the time specified by the lease. . . . . .*

Where the lessee's good faith in the performance of acts preliminary to the commencement of actual drilling is established by uncontroverted evidence of actual completion of the well with due diligence, or the pleadings of the lessee allege that the preliminary acts were done with the bona fide intent of drilling the well with due diligence, the court may rule as a matter of law that these acts were sufficient to constitute a beginning of operations." (emphasis supplied)

Under so much of the above rule as quoted, it would seem that the fact that Shell did drill D'Lo No. 1 to the required depth makes its intent to drill unquestionable, and would pretermit the necessity of proving intent. But, plaintiff points to the following language in Summers following the above quote:

"On the other hand, where the lessee has taken such preliminary steps within the time limited, but is prevented from continuing drilling operations by the lessor, then the intent with which these preliminary acts were done becomes material."

Although plaintiff took no formal or judicial steps to prevent Shell from continuing drilling operations, plaintiff con-

tends that, on March 28, 1969, when its board members asked Shell's on shore division land manager, Marshall, what Shell's intentions were, Marshall's reply evidenced Shell's lack of bona fide intent. Further, plaintiff argues that Bridges was the only Shell employee plaintiff had ever dealt with, and when Bridges identified Marshall as the man who would know Shell's intent, plaintiff had a right to rely on Marshall's response.

Before agreeing or disagreeing with these assertions, the Court finds it necessary to consider all the circumstances attendant here, including those advanced by the defendant.

Testifying for the defendant was John M. McClain, a senior petroleum engineer for Shell. He was second in command of Shell's production division at the time the Thomasville Field was developed. The discovery well was the Garrett well which was spudded June 11, 1968. This well was a deep well to test the Smackover structure. It was McClain's duty to evaluate it. The first indications of the Garrett well's productivity were "kicks" registered from the Smackover, indicating that gas was getting through the mud-weight to the surface. Although this was not desirable, it indicated a very high pressure and good productivity. The next indications were cores cut from the Smackover. The electric logs were completed on February 8, 1969. These logs indicated a reservoir of 206 feet of net pay, meaning a particular strata that would be profitable depending on porocity. The witness claimed that Shell has developed the basic formula in interpreting the use of electric logs, and that, as a diagnostic tool, the electric logs are the best for measuring characteristics in place. On the log reading from the Garrett well on February 8, 1969, it was his opinion that Shell had a good discovery well. The witness recommended the drilling of D'Lo No. 1 in an adjacent land section. The decision to drill was made on February 19, 1969 by Charles L. Blackburn, general manager of Shell's on-shore pro-

duction division. The location was staked by Shell's engineers, survey division, on February 24, 1969. The Court interrupts this witness's testimony to give a chronology of events appearing in defendant's answers to interrogatories, admitted as an exhibit herein, and which answers are supported by testimony and other exhibits. Following a survey to locate and stake the location, the location was laid out on February 25, 1969. From February 26 through February 28, specifications for the location work were mailed to interested construction contractors for the dirt work. On March 3, 1969, the location was shown to dirt contractors. On March 6 bids were received. On March 7 and 8, 1969, the bids were evaluated and an agreement was made with W. S. Hancock on an hourly basis to prepare the location. The dirt contractor moved on to the site the next day. From March 9 through 13, the contractor cleared timber from the access road right-of-way, and installed culverts, providing an exit from the public road to the well location. On March 11, the contractor cleared timber from the location site and pit areas. From March 10 through 31, his crew constructed a roadbed to the site, ditched the right-of-way for drainage and laid a board road. From March 17 through April 14, 1969, the reserve pit and water pit were constructed with the use of a dragline and bulldozer. From March 31 through April 4, the location was leveled and drainage provided. From April 2 through April 14, boarding was laid for the rig mat and turn-around area. On April 7, the surface conductor pipe was set. On April 11 and 12 a water well was drilled. Also on April 12 the mud tank was moved in. From April 12 through 20, the drilling rig was moved in and erected, and on April 21, 1969, the well was spudded. Hancock's invoice for the dirt work is in evidence reflecting his charges for equipment and crew from March 9 through April 14, 1969. This invoice shows that a bulldozer, swamper and dragline constituted the equipment. The crew included a pusher and from 4 to as many as 13 roust-

abouts, the total bill being the sum of $21,571.73. Returning to McClain's testimony, he was on the site during the preliminary phases. He stated that it was necessary for the contractor to board the access road for a distance of over 1200 feet to the well location and do everything that was done for a big rig and that all was necessary. Omitting his disagreement with plaintiff's witness, Knight, as to the extent the D'Lo well may have condemned the minerals in adjacent property, McClain on cross-examination stated that Shell had a letter agreement with T. L. Owen Drilling Co., Inc., owner of a smaller drilling rig than that ultimately used, reduced to contract form on April 2, 1969, which was used to spud the well. The Court interrupts again to note that on a fly sheet attached to this contract, put in evidence by plaintiff, is an intra-office memo that the Owens' rig was requested because it was in the area, was needed because the lease was expiring and the only big rig available to drill this well to total depth was then located at the Garrett well. McClain acknowledged that Shell representatives requested plaintiff for an extension of the leases, as testified to by Biggs, admitting that the production division would have liked to have had more time, but was definite in saying that as of February 24, 1969, the date the D'Lo No. 1 well location was staked, Shell's production division committed itself to drill, notwithstanding anything Marshall may have said who was not in the production division and who had no part in making the decision to drill.

Herman Bridges, a senior land man for Shell acknowledged that he negotiated the leases with plaintiff for which Shell paid $100,000.00 as a bonus. He recalled meeting with Biggs, Van Zandt and a third man early in March 1969. He could not recall the exact date. Being in the land division and not in production he could give no information as to Shell's plans about the D'Lo well. He did place a call for Biggs to Marshall, as his superior. He did not hear the ensuing conversation.

John Marshall, divisional on-shore land manager for Shell, described his duties as related to acquiring leases and clearing titles. He stated that the land division had no authority to direct drilling, either in the preliminary stages or the actual drilling. He and Bridges had attempted to get extensions of the D'Lo leases, offering first $10,000.00, and later $25,000.00 to no avail. His superior, Charles Blackburn, authorized the offers. They were rejected. He did not recall the date of Biggs' call, but remembered the substance of it. Biggs asked if Shell was going to dig the D'Lo well to 17,000 feet. Marshall said his response was that he did not know if the well was going all the way to a 17,000 depth, but that operations were under way. He didn't recall whether he mentioned the CO content of the Garrett well, but he definitely denied saying that D'Lo would not be drilled depending on the production tests of the Garrett well.

James Robert Coats, an engineering assistant with Shell in the production department, said that he was the job inspector for the drill site preparation. He first went to the drill site on Sunday, March 9, 1969 and met Hancock and his crew that day, and was there every day. On the first day a brush line had been cut from the county road to the stake at the well site. The county road had to be widened in order for the heavy equipment to turn on the access road. A culvert was installed at the turn. This was completed the first day. From then until April 14, the right-of-way for the access road was cleared of timber. On Monday it started raining. The bulldozer was used to pile brush. The dragline was used to push mud up for the bed of the road way and to dig draining trenches on either side. It was necessary first to lay polyethylene, then boards and plywood because there was no firmness to the ground, then a third layer of boards the width of the wheels of vehicles used and to be used. The witness said it took until April 14, 1969 to get the site ready. He reported the progress every two to

three days to the New Orleans office, these reports covering the period from March 10 through April 14, 1969. Copies of his "Facility Cost Analysis" are in evidence. In his opinion this was not an unusual length of time considering the weather conditions, and the size of the rig required to dig a deep well. As this contract was on an hourly basis, it was the witness's job to see that the time was well spent. He stated that there were no delays except those caused by bad weather.

August Treuting, a senior title analyst in Shell's land department, identified delayed rental checks and receipts covering the leases for the years 1969, 1970, 1971. The receipts were acknowledged by Deposit Guaranty Bank, plaintiff's depository. On February 23, 1972, this bank returned Shell's checks which was Shell's first knowledge that the delayed rentals had not been accepted. Shell returned them to the bank.

Rayford Hancock, an employee of W. S. Hancock, the dirt contractor, testified that he was present at the well site every day while it was being prepared for drilling. He stated that the spring rains made the working conditions as bad as any he had ever encountered, and that the county road at the point of the access road was impassible, making it necessary to repair it and install a culvert for drainage before building the access road. Because the terrain was too soggy to support the bulldozer, timber along the access road right-of-way had to be cut by hand. The dirt contractor was paid for his equipment and crews on a cost plus basis and by the hour, with a Shell man there to see that the crew kept busy.

Henry Burton, Hancock's foreman on the dirt work, ran the bulldozer. He said the bulldozer was mired part of the time, and that he had to use the dragline to lay up the bed of the access road before it could be boarded. In his opinion the site work could not have been completed quicker than it was.

Mr. Charles L. Blackburn, general manager of Shell's on-shore division with supervision over exploration and drilling, said he was the official who had authority to determine to drill. With respect to D'Lo No. 1, he had authority to authorize funds for drilling and he did so in late February after he received the first electric logs from the Garrett well. His staff recommended the drilling and he ordered it. Shell's legal department advised him that if the drilling took place diligently, the leases would remain effective. He did not face the contingency of what the Garrett well production tests would show as the decision to drill had already been made. Defendant also asserts that plaintiff, in response to defendant's contention that, plaintiff, by accepting the delayed rentals for the years 1969, 1970, 1971, and by failing to register any objection to defendant's appearance before the Oil and Gas Board in having 80 acres of the leased premises included in a 1240 acre gas unit with respect to the Shell-Burch No. 1 well in the Thomasville Field, is estopped to plead forfeiture. Plaintiff necessarily concedes knowledge of Shell's appearance before the board for one of its directors was present during the proceedings.

Plaintiff's response to this is that their leases were not "or" or "unless" leases, that is, effective in the absence of drilling so long as delayed rentals were paid. It is true that the payment of delayed rentals was a separate requirement in these particular leases, and not equivalent to the requirement to commence operations toward the drilling of a well. Nevertheless, acceptance of the delayed rentals up until shortly before this suit was filed is a circumstance not in plaintiff's favor in seeking a forfeiture.

The Court has carefully weighed the circumstances surrounding Shell's intentions to drill, and finds that the evidence of Shell's witnesses, supported by its documentary evidence, shows without question that, despite Marshall's equivocal statements to plaintiff's board members, the intention to drill was made on February 19, 1969, at a time when the

leases were effective, and by those in authority to make such decision; that the well location was staked on February 24, 1969; that preliminary site work, being a part of the drilling operations, was commenced prior to the expiration date of the leases, and proceeded with diligence; and that actual drilling thereafter proceeded with diligence until the well was spudded on April 21, 1969.

■ The Court further finds that the shut-in payment made by defendant to plaintiff on April 27, 1972, was timely made. Under Paragraph 4(e) shut-in royalties were to be paid within 90 days of the expiration of the primary term, which under Paragraph 2 was four years from date.

The Court, on the basis of its findings above, concludes that plaintiff's action is without merit and should be dismissed.

An order dismissing the action may be submitted within the time provided by the rules of this Court, with court costs taxed to the plaintiff. Upon the entry of a final judgment herein, the Clerk of this Court is directed to pay to plaintiff the sum of $1600.00 being the amount of shut-in royalties tendered by Shell into the registry of the Court.